LUIS S. MURCELO ET UX., Plaintiffs and Appellees, *v.* H. I. HETTINGER & CO. and PUERTO RICO TELEPHONE CO., Defendants and the former Appellant.

No. R-63-242.      Decided May 24, 1965.

*Francisco Ponsa Feliú* for appellant. *Amadeo & Suro* for appellees.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

On September 14, 1961, Luis S. Murcelo and his wife Francisca Pérez Rivera filed an action against H. I. Hettinger & Co. and Puerto Rico Telephone Company in the San Juan Part of the Superior Court, claiming $100,000 for damages suffered by them as a result of the death of their son José Efraín Murcelo Pérez.

It was alleged in the complaint, among other things:

"1. Plaintiffs are the parents with patria potestas of minor José Efraín Murcelo Pérez, who died some time in the afternoon of September 9, 1961, as a result of asphyxia by submersion in an excavation which the two defendants, or one of them, had left without adequate protection on the edge of the marginal street alongside Baldorioty Avenue, in front of building 14 of Lloréns Torres housing project of San Juan, Puerto Rico.

"2. The said defendants, notwithstanding they knew, or should have known, that small children gathered in that place, left unprotected an excavation of about 8 or 10 feet deep which, as a result of the rains became full of water on the date of the accident mentioned in this complaint and preceding days, constituting an evident danger for such minors.

"3. While playing on the surroundings of the excavation minor José Efraín Murcelo Pérez fell into the hole and was drowned, as alleged in the preceding first paragraph.

"4. The proximate cause of the accident mentioned in the preceding paragraphs was the gross negligence of defendants,

or of one of them working as agent for the other, in failing to take due precautions to prevent minors from falling into said excavation."

In its answer, H. I. Hettinger & Co. only alleged: ". . . it denies each and all of the allegations of the complaint."[1]

On the following October 6 plaintiffs served an interrogatory on the appellee, which the latter answered under oath.

At the trial plaintiffs offered in evidence the following questions and the correlative answers which were admitted without defendant's objection:

*Question No. 1.* "State whether codefendant H. I. Hettinger & Co. performed any excavation work *at some place of the marginal street* alongside Baldorioty Avenue and, specifically, *whether it made any excavation in front of building 14 of* Lloréns Torres *housing project." Answer:* "Yes."

". . . . . . . . ."

*Question No. 3.* "Describe the work which codefendant Hettinger was performing for codefendant Puerto Rico Telephone on or about September 9, 1961." *Answer:* "Underground telephone installation."

*Question No. 4.* "State whether or not it is true that codefendant Hettinger & Co., its agents or employees *were making excavations on the marginal street* alongside Baldorioty de Castro Avenue of Santurce. State, specifically, whether or not it is true that a hole was dug *in front of building No. 14* of Lloréns Torres housing project of Santurce." *Answer:* "Yes."

*Question No. 5.* "State the size, width, length and depth referred to in the preceding question." *Answer:* "16' 4" long, 9' 10" wide and 10' deep."

*Question No. 6.* "When was that hole dug? *Answer:* "August 30, 1961."

---

[1] We shall not mention the allegations and actions in the litigation of codefendant Puerto Rico Telephone Co. since the final judgment exonerated it completely from liability, from which plaintiffs took no appeal. Hereafter, in using the expression "the defendant" or the word "appellee," we shall refer only to H. I. Hettinger & Co.

The case went to trial on July 22, 1963. The additional evidence presented by plaintiffs consists of: the testimonies of the plaintiff spouses and of Julio Rojas Cruz, a copy of the death certificate of the child José Efraín Murcelo, birth certificate of the child, and a photograph "of the place of the occurrence."

When it was defendant's turn to present evidence, it said that it had no evidence to offer and that it submitted the case without any.[2]

Defendant having challenged the judgment appealed from, mainly on the ground that "the evidence presented is insufficient as a matter of law," we shall make a summary of the evidence offered by plaintiffs.

Evidence Appearing from the Interrogatories. We have already seen that from the admissions made by defendant, under oath, on August 30, 1961, it performed some excavation work *on a marginal public street* alongside Baldorioty Avenue of Santurce, *in front of building 14 of Lloréns Torres public housing project*, for the installation of the underground telephone system, where it dug a hole 16 feet 4 inches long, 9 feet 10 inches wide, and 10 feet deep.

Death Certificate. Exh. I. It appears therefrom that the child José Efraín Murcelo Pérez died on September 9, 1961, and that the proximate cause of his death was "asphyxia by submersion."

Birth Certificate. Exh. II. It reveals that José Efraín

---

[2] When the witnesses were called and sworn in, defendant informed the court that its witnesses were named José Santos, Gonzalo Girau, José M. Rivera, and also that it would produce as a witness "another man who is in the courtroom" and a "member of the police who is on duty in Mayagüez." On October 27, 1961, in its sworn answer to an interrogatory of plaintiffs, defendant had informed them that · Librada Huertas, Sergio Santiago, Víctor Colón, and Juan Luis Rosado, residents of Lloréns Torres housing project, and "Rufino Colón, in care of Hettinger & Co.," would also be its defense witnesses. *It also informed them in that sworn answer that the said Librada Huertas witnessed the accident.*

Murcelo Pérez, son of Simplicio Murcelo and Francisca Pérez, was born on April 9, 1953.

Photograph of the Excavation. Exh. III. It shows the exit or mouth of the hole, covered in part by some sort of a plank.

Alongside the hole there appears an opening of more or less the same width as one of the boards which make up the said plank.

This photograph was admitted over defendant's objection "for the purpose of determining its usefulness to the court in the final clarification of the facts in this case."

Testimony of Francisca Pérez. This coplaintiff testified, in its pertinent part, that she was married to Luis Simplicio Murcelo; was the mother of Efraín, "the deceased child"; the latter was eight years old in September 1961; he lived with them; they had four children; they lived in building 16, apartment 325, of Lloréns Torres housing project; was a housewife; that day—September 9, 1961—". . . I was busy, washing, starching, scrubbing the. floor, when my child— Efraín—*who was playing around there*, came up and said to me: 'Mammy, give me two pennies,' and said to me 'I'm going to buy some small toys'; then I got up and gave him the two pennies; and *about 15 or 20 minutes later* the little boy, the son of the woman who is seated there, came up and says: 'Doña' " . . . (objection made at this point). She further testified: that her son was going to buy something in the store "nearby, there, where they sell candy and other things"; within the housing project, "he went to buy a small toy of those called, I believe, 'hicotelo' or something like that"; that her son Efraín was "the youngest"; she learned that something had happened to him when another little boy, the son of another woman, arrived at her house; "I went hurriedly to get the police and then the police came"; the death of her son affected her; the excavation had been made at about 100 meters from the place where she lived

with her children; she had not seen that excavation prior to the day of the accident; saw it that day for the first time; that day her son was about 100 meters away from the house *"in the same place where the children used to go"*; in her opinion that place, 100 meters distant from her house, "was the place for him to play, the surroundings"; she had not sent Efraín to school because he was young "and it was necessary to cross the avenue," and "in two cases they had been run over by cars," and she was waiting for him to attain nine years to send him.

Testimony of Julio Rojas Cruz. He testified, in the pertinent part, that on September 9, 1961, "he was in Doña Carmen bar, when I looked this way and saw many people . . . at the place of the excavation . . . I went to the place and there was a policeman . . . I asked him permission to go into the excavation to bring the victim out"; that the water was black and for that reason he could not see the bottom; after talking with the policeman "He said I could under my responsibility, and I said 'of course,' and then with my clothes on I plunged in until I brought the victim out"; *Juan Luis Rosado helped him*; he could go down "Because one of the corners was hollow." He identified the photograph of the excavation. When he was asked "And when you jumped *into the excavation, to what part of the excavation do you refer?*," he answered "I would say that this excavation had a second opening on the left-hand side. There were no boards on the right-hand side and on the left side also." At the request of the defense attorney, the latter was eliminated because they did not appear in the photograph and because "he was not asked." The photograph only showed part of the plank and an opening; it did not show the place where the witness said the opening was. He further testified that he jumped between the missing boards in order to search for the victim; "I tried about three times until finally I decided to jump through one of the frames and was able to bring

him out"; what was in there was "the body of the little boy." The parties then stipulated that what was brought out from the excavation "was the body of the little boy"; that he did not see any watchmen near the excavation; nor was the excavation so made as to prevent access thereto, since it was not fenced; that he did not have to jump over any fence to reach the excavation; that the excavation was on lands of Lloréns Torres housing project "between building 13 and building 12"; he had observed it prior to that day because he used to go there frequently.

He further testified that he had pulled the boy out around five in the afternoon of Saturday, September 9, 1961. He identified policeman José M. Rivera, who was in court, as the policeman who permitted him that afternoon to go down to the bottom of the excavation.

Testimony of Luis S. Murcelo. This coplaintiff, father of the drowned boy, in the pertinent part testified: He was working in San Juan in the afternoon of September 9, 1961; one of his neighbors arrived at his place of work in San Juan and gave him the news; upon learning the news "I took a taxi immediately and came home . . . I went to the scene of the occurrence and saw many people gathered there . . . that was on the avenue, on the side of Lloréns Torres, near building 13 . . . and when I drew near they had already brought him out from the hole and was lying on top of the plank . . . a baby, my son . . . he was dead . . . I was so overcome by emotion that I took the baby . . . and I went to the hospital with him." He further testified that he had lived 10 years in the housing project; that he is well acquainted with the surroundings of the project; that the place where the excavation had been made was frequented by children; that the children who lived in that neighborhood sometimes played there; that as a result of his son's death he endured suffering, illness, anguish. He also testified that he had seen the excavation prior to Septem-

ber 9, 1961, and that "he had seen it before" because "that place is nearer to cross to Muñoz Rivera to buy things for the house, so I passed by that place."

In the light of that evidence, the trial court made the following expressions and findings of fact:

"The findings of fact are based solely on plaintiffs' evidence. The same has not been controverted in any manner whatsoever since, as stated before, defendants presented no evidence. There is not, therefore, conflict of evidence to be decided by this court.

## "FINDINGS OF FACT

"From a study and analysis of the evidence heard and admitted, the court is of the opinion that the following facts have been duly established:

"1. Some time in the months of August and September 1961 codefendant H. I. Hettinger & Co., under a contract with the other codefendant, Puerto Rico Telephone Co., was making excavations for telephone installations on certain lands adjacent to Lloréns Torres housing project. One of these excavations which was dug in front of building No. 14 in the housing project was 16 feet 4 inches (16′ 4″) long by 9 feet 10 inches (9′ 10″) wide and ten feet (10′) deep.

"2. Minor José Efraín Murcelo Pérez lived with plaintiffs in one of the apartments of building No. 16 of the project. The place where the excavation was made in front of building No. 14 was, prior thereto and during the construction of such works, the customary playground of the children who lived in that project.

"3. In the afternoon hours of September 9, 1961, minor José Efraín Murcelo Pérez, who at the time was eight (8) years old, fell into the excavation to which we have made reference which was filled with dark water. He fell through an opening in the mouth of the excavation, as it appears from the photograph presented in evidence.

"4. When the minor fell into the excavation full of water, Julio Rojas and Juan Luis Rosario who were about the place went to his rescue and, although with difficulty because of the darkness and filth of the water, they finally brought the minor

out to the surface. The evidence shows that the minor died as a result of asphyxia by submersion.

"5. At the time of the accident there was no one employed by defendants near the excavation, nor were there any barriers or fences to prevent the children's access to the works.

"6. Minor José Efraín Murcelo Pérez was eight (8) years old, and owing to his tender age and the darkness of the water which filled the excavation he could not appreciate the danger of the excavation maintained at that place by defendant H. I. Hettinger & Co.

"7. Plaintiffs' evidence shows that H. I. Hettinger & Co. was the one in control of the works, there being nothing in the evidence heard before the court to suggest that codefendant Puerto Rico Telephone Company had any intervention or participation in the works being performed.

"8. The proximate and sole cause of the accident sustained by the minor son of plaintiffs herein is the negligence of defendant H. I. Hettinger & Co. in failing to maintain, particularly at such hours in which it was logical to assume and expect that minor children could come near the excavation, means to prevent the dangerous condition which it constituted. From the photograph in the record it clearly appears that a minimum investment would have been required of defendant to guard completely the excavation, and thus avoid accidents such as that suffered by minor José Efraín Murcelo Pérez.

"9. Plaintiffs Luis S. Murcelo and his wife Francisca Pérez Rivera are the parents of the deceased minor, who lived with them in Lloréns Torres housing project. As a result of the minor's death, plaintiffs suffered mental anguish and the sorrow to be expected for the death of a loved one. The court assesses plaintiffs' damages at the sum of FIFTEEN THOUSAND DOLLARS ($15,000)."

In its conclusions of law the trial court determined (1) that §§ 1802 and 1803 of the Civil Code were applicable to the case; (2) that in maintaining the wooden plank which covered the excavation with an opening therein, defendant created a trap which represented a clear and manifest danger to a child, particularly if it is taken into consideration that the stagnant water of the excavation was dark and

dirty, which did not permit one to appreciate its depth; (3) that defendant was negligent in maintaining such condition on lands of a public housing project which were used as a recreation area, a fact which was known to defendant or which it should have reasonably known; (4) that the facts clearly placed the case within one of the exceptions contemplated in *Vargas* v. *Water Resources Authority*,[3] 86 P.R.R. 99 (1962); (5) that defendant not only "could or should have anticipated the presence of children near the excavation, appears clearly from its conduct in covering the same, although improperly, with a wooden plank, and that the elimination of such danger to the minors would not have represented considerable expense to it. It was only necessary to make the platform a little larger to cover the whole excavation," and that the child was not exactly a trespasser.

The trial court further concluded that defendant had been "obstinate in the defense of this litigation," and that

[3] In that case a child was drowned in an irrigation canal. The complete text of the paragraph of that decision cited by the trial court is as follows:

"The rule which we have set forth has exceptions. Among others, there is one which imposes liability on the owner of the place containing such bodies of water, if they present or contain devices which make them attractive, *Davies* v. *Land O'Lakes Racing Ass.*, 69 N.W.2d 642 (Minn. 1955), or which constitute a trap or present a clear and manifest danger. *Saxton* v. *Plum Orchards*, 40 So.2d 791 (La. 1949). Another circumstance to be considered is the location, whether they are near populated areas or roads. *Banker* v. *McLaughlin*, 208 S.W.2d 843 (Texas 1948). A swimming pool in a populated area was recently considered to fall within the exception. *King* v. *Lennen*, 1 Cal. Rptr. 665 (1959); see note in 9 Stan. L. Rev. 204 (1956). It is also a factor for consideration if the surroundings of the place where the body of water is located are used by children as a recreative area, and the owner knows or reasonably should know that fact. *Altenbach* v. *Lehigh Valley R. Co.*, 37 A.2d 429 (Pa. 1944); *Barlow* v. *Gurney*, 29 S.E.2d 680 (N.C. 1944). But see *Torres* v. *Wirshing & Co.*, 78 P.R.R. 614 (1955). It would be practically impossible to determine beforehand in which circumstances liability could be imposed by way of exception. Thus, each case must be considered and decided according to the facts which it presents. *Díaz Pérez* v. *Commonwealth*, Civil Case No. 12274, decided June 11, 1959. Prosser, *Trespassing Children, supra* at 460–61."

the imposition of attorney's fees in the sum of $1,500 was proper.

Based on these conclusions, it rendered judgment on September 6, 1963, sustaining the complaint only as to H. I. Hettinger & Company, and ordering it to pay $15,000 as indemnity for the damages suffered by plaintiffs and $1,500 for attorney's fees.

In this appeal defendant relies on the memorandum which it presented with its petition for review. Summing up its position therein, it says: "It may be seen that appellant's contention is that plaintiffs, according to their own evidence, are not entitled to judgment in their favor, or, what is the same, that the evidence presented is insufficient as a matter of law." It also maintains that the judgment rendered is mere speculation and inference, and that the *res ipsa loquitur* rule was unduly applied since there was no showing of causal relation between the damage claimed and appellant's action. It is not right; the judgment must be affirmed.

■ The owner of inanimate objects, one who has lasting and immediate contact with them or their usefulness, or uses them to his advantage, and sometimes its architect or builder, is bound to repair the damages caused or produced by such inanimate objects through his fault or negligence.

■ Our Civil Code, in its §§ 1807, 1808, 1809 and 1810, formulates the declaration of liability enumerating the following things which may mostly cause or give occasion to these damages: (1) collapse of buildings; (2) the explosion of machines which "may not have been cared for with due diligence"; (3) the kindling of explosive substances which "may not have been placed in a safe and proper place"; (4) excessive smoke which may be "noxious to persons or properties"; (5) the fall of trees "in places of transit," when not caused by force majeure; (6) the emanations of

sewers or deposits of infectious matters, when "constructed without precautions proper for the place where they are located." The head of a family who dwells in a house or in a part of the same is liable for the damages caused by the things which may be thrown or which may fall therefrom.

This enumeration of the Code is not exhaustive; it does not have the character of *numerus clausus*; it admits the possibility of including any other inanimate objects which may produce similar effects and constitute sources of damage.[4]

Considering the facts and all the concurring circumstances of the case, appellant is civilly liable for the damages suffered by plaintiffs.

■■ In the first place, because in a certain sense the attractive nuisance doctrine may be legally applied to these facts. The condition of easy accessibility to the moving cause of the damage is an important factor to be considered. *Best v. District of Columbia*, 291 U.S. 411 (1934). Anglo-American case law gives great weight to the application of the doctrine to the location factor. Consequently, an inanimate object which if found in private property could not be considered as an attractive nuisance, could be so characterized considering the fact itself of its location; that is, of being situated in a public highway. Annotation, *Liability of landowner for drowning of child*, 8 A.L.R.2d 1254, 1289; *Halmberg v. Chicago*, 24 Ill. App. 505 (1927); *Indianapolis v. Emmelman*, 108 Ind. 530, 9 N.E. 155 (1886). The effect of that distinction is to obligate those using our public lands

---

[4] See, among others, *Vélez v. The Capital*, 77 P.R.R. 663 (1954), damage produced by the roots of a tree; *Gutiérrez v. Bahr*, 78 P.R.R. 451, 452 (1955), damage sustained as a result of unsafe conditions of certain jewelry shop premises. In this case we said, among other things: "The damage caused by inanimate objects falls within the form of omission, omission of the tutelary care for the protection of another's life or property."

and thoroughfares, altering their natural state or condition, to adopt the measures necessary to prevent the occurrence of foreseeable accidents such as the present.

■ In the second place, if we should fail to apply the attractive nuisance doctrine to these facts, we could still hold appellant liable. Its action in excavating a public thoroughfare, thereby altering its normal condition or state, made it its duty to take all necessary precautions not only to restore the thoroughfare to its original condition upon termination of the work, but also to take due precautions in the meantime to prevent that any person—regardless of his age, sex and condition—traveling along the same may do so without running the risk of suffering an accident as a result or product of such alteration. II Shearman and Redfield, A Treatise on the Law of Negligence 875; *Smith* v. *Foley Constructing Co.*, 237 N.Y. 601, 143 N.E. 759; *Charlock* v. *Freal*, 125 N.Y. 357, 26 N.E. 262. The more so in the case, as here, of a public thoroughfare situated in a thickly populated zone.

Appellant's action in placing or maintaining over the excavation an incomplete plank, in failing to fence off its surroundings or posting notices or signs of the alteration of the marginal street, in permitting the rain water to accumulate in the hole, having the necessary means to prevent such accumulation, all of this, coupled with the fact that the excavation was made on a thoroughfare adjacent to a thickly populated public urbanization where a substantial portion of our juvenile population grows and develops, leads us to the inescapable conclusion that the failure to do its duty and its negligent action was precisely the sole cause of the accident.

Its contention in the sense that the allegations and the evidence are insufficient to discover the agent or thing labelled attractive nuisance is also untenable. Both the allegations and the evidence pointed out the measures, physical

condition, location and other details connected with the excavation which all together furnished a sufficient description of the place, thing or condition characterized as attractive nuisance by the trial court.

Appellant also points out plaintiffs' contributory negligence and the minor as the proximate cause of the accident.

■ We have found nothing in appellant's allegations nor in the evidence sent up to us to indicate that such assignment was raised in the trial court. On the contrary, from those documents it clearly appears that appellant merely relied on plaintiffs' evidence, without raising any defense or theory in its favor before that court. In view of that situation, this Court will not consider questions which were not raised by the parties nor considered by the trial court. *Heirs of Escalera* v. *Barreto*, 81 P.R.R. 580 (1959); *McCormick* v. *McCormick*, 52 P.R.R. 669 (1938).

The trier is always inevitably bound to render a judgment with a definite content. He should not refuse to rule under pretext of silence, obscurity, or insufficiency of the law, or for any other reason whenever there exists some damage to be repaired or another's rights have been illegally invaded.

■ We know that the party holding the affirmative of the issue must produce the evidence to prove it. Sections 1168 of the Civil Code and 108 and 162(5) of the Law of Evidence. However, as a general rule, the law does not require that degree of proof which, excluding the possibility of error, produces absolute certainty, because such proof—the law asserts—is rarely possible. Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind. It is not necessary to prove the case with mathematical exactitude through direct evidence, nor conclusively, nor produce such perfect degree of conviction as not to admit the possibility of opposing evidence. The litigant may prove his case through indirect evi-

dence, which is of two kinds, inferences and presumptions. Inference is the deduction from the facts proved or fully established made by the trier in his discernment. Some times it is characterized as *hominis* presumption. That discernment represents an evaluating human activity of comparison or confrontation, an internal process which constitutes, in the opinion of professor Serra Domínguez,[5] something unapproachable: the movement of man's reason.

In this type of action plaintiffs, after presenting evidence in the light of which a reasonable person may be convinced that the wrongful act is due to defendant's fault or omission, are not bound to eliminate or exclude every other possible cause of the occurrence from which the required liability is derived. Even in the penal field, when The People only offers circumstantial evidence of guilt, such evidence need not be inconsistent with any reasonable hypothesis of innocence. *People* v. *Bonilla*, 78 P.R.R. 144 (1955).

As we have seen, plaintiff presented specific evidence on the facts which showed, through the establishment of inferences on the basis of such facts, the manner in which the accident occurred, in which case the application or non-application of the *res ipsa loquitur* doctrine may not have any effect.

Appellant also alleges: "The trial court rests on the 'attractive nuisance' doctrine. In other words, in invoking that doctrine it rests on the exceptions holding defendant liable. And citing *Vargas* v. *Water Resources Authority*, September 28, 1962, it relies on the exceptions pointed out in the decision holding defendant liable."

■ The attractive nuisance doctrine, the product of a judicial dissatisfaction in view of the results obtained in applying to children the general rule that the owners and

---

[5] See his interesting work *"Normas de Presunción en el Código Civil"* 6, *Ediciones Nautas, S.A.*, Barcelona, 1963.

possessors of lands are not liable for the damages caused by dangerous physical conditions existing in their lands whenever the aggrieved parties are mere transgressors, embraces in its legal ark the real and positive judicial recognition that a child, because of his ingenuity, immaturity and lack of judgment, is incapable of appreciating all the dangers involved in trespassing the limits of another's property. Its principles also embrace the practical reality that parents cannot nor should keep their children within four walls, or follow them wherever they may go. The legal system, in confronting the conflict of interests created among owners, on the one hand, and society for the protection of its children, on the other hand, must yield to the latter, obligating the former to take certain precautionary measures whenever the existing conditions tend to show the possibility of the presence of children on or about their properties. Such doctrine does not recognize complete protection of the child against everything that may happen to him; yet, it requires certain minimum elements of foreseeability and protection which, if not met, hold such owners liable for the damages caused. It has been said that the true justification or basis of the doctrine is nothing more than the foreseeability of harm to the child, and the considerations of common humanity and social policy which, as in other negligence cases, operate to bring about a balancing of the conflicting interests and to curtail to some reasonable extent the owner's privilege to act as he sees fit without minding the protection of others.[6]

At first the rule was applied only when the generating cause of the harm (the attractive nuisance itself) possessed certain physical qualities which produced in the child's mind a temptation, enticement or allurement which induced him to come nearby, resulting in the accident. Prosser, *Trespassing Children*, 47 Calif. L. Rev. 427; *United Zinc & Chemi-*

---

[6] Prosser, Law of Torts, *supra* at 440.

*cal Co.* v. *Britt,* 258 U.S. 268 (1921). However, nowadays the weight of authority has accepted the application of the rule, even if the element of allurement is lacking. Such quality shall be considered only for the purpose of determining whether, owing to the existence of such attractive element, the owner should have foreseen the presence of children on his land and their trespassing.

In applying the rule to specific cases for the purpose of holding the owner legally liable, the courts have pointed out several criteria or factors which should be considered and be present as a requisite for determining the duty of foreseeability to be imposed upon the owner. Thus, the fact that the *generating cause is proximate to, or is situated in, places where children are likely to pass or play; the accessibility to the object or dangerous condition*; the determination that there have been similar trespasses prior thereto; and the fact, mentioned above, that the object possesses intrinsically certain attractive qualities, have been prevailing tests in such determination.

As correctly stated by the trial court, the negligence in maintaining that excavation such a long time, within the project, "created a trap which represented a clear and manifest danger to a child . . . particularly if it is taken into consideration that the stagnant water in the excavation was dark and dirty and did not permit one to see the depth of the excavation."

That trap, we add, meant a potential serious hazard to children playing around there, to adults and to any passerby. In those places frequented by children it is to be expected that they will do precisely what appellant suggests: that while playing they pass by the excavations full of water, or that they try to jump over them, that they do not notice the place where they play, or that in their state of innocence they jump of their own accord into those bodies of turbid waters and treacherous depth. In view of the concrete cir-

cumstances concurring in the present case, the party creating and maintaining the dangerous inanimate object or the situation of serious and unreasonable risk should be liable for the consequences of the omission of that step which was required by the character of its clear duties and which pertained to the circumstances of the persons, time and place. See §§ 1057 and 1803 of the Civil Code. There is no doubt that the harm sustained by the child was the necessary consequence of the culpable omission of H. I. Hettinger & Co., and this constitutes the causal connection in this case.

The evidence presented to the effect that the body of the child was found in the excavation; that only 15 or 20 minutes had elapsed since the unfortunate child was seen alive until his body was brought out from the excavation; the existence of the opening at the moment witness Rojas Cruz requested permission from the public peace officer to search for the body in the excavation, and the black condition of the water at the time; all of this, taken as a whole, is sufficient to justify the inferences established by the trial court. Similar inferences were established by the Supreme Court of Louisiana in *Saxton* v. *Plum Orchards*, 40 So.2d 791 (1949). The accident in that case was very similar to the present, and the court said the following:

"In this court defense counsel called attention to the fact that there were no eyewitnesses to the accident and that plaintiffs have not offered any direct proof of death of the child by drowning. They state in their brief here: 'There is a possibility that she could have been pushed or thrown into the pond by a third party.' This point apparently was not raised in the Court of Appeal, for we find no mention of it in counsel's brief filed there or in the written opinion of that court. *Be that as it may, a strong inference arises from the circumstantial evidence that the child walked or fell into the pool and that her death resulted solely from drowning. The body was found in the pool; the artificial respiration administered to it produced some water; and no one was seen at or near the pool during*

*the two hour period in which the child was missing. And since this inference has not been overcome or rebutted it will be accepted as establishing the manner and cause of death.* [Citations.]" (Italics ours.)

Appellant contends that the evidence presented is insufficient to conclude as a matter of law that the proximate cause of the accident was its negligence in failing to maintain means to prevent the hazardous condition.

█ In view of appellees' contention that there were no eyewitnesses to the accident, a fact extraneous to them, appellant seeks to place them in the difficult situation of proving their case with exclusion of any other possibility. That is not their duty. We have already stated the extent of plaintiffs' duty to establish liability. The Supreme Court of Idaho, in a situation of facts similar to the one under consideration, said:

" 'There are very few things in human affairs, and especially in litigation involving damages, that can be established to such an absolute certainty as to exclude the possibility, or even some probability, that another cause or reason may have been the true cause or reason for the damage rather than the one alleged by the plaintiff. *But such possibility, or even probability, is not to be allowed to defeat the right of recovery, where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence as to justify* a reasonable juror in concluding that the thing charged was the prime and moving cause,' and 'it is not necessary to exclude the possibility, or even some probability, that another cause or reason may have been the true cause or reason for the damage, rather than the one alleged by a claimant.' [Citations.]"[7] (Italics ours.)

█ We said that defendant elected not to present any evidence. Unless by law the burden of proof is on defendant,

---

[7] *Hendrix* v. *City of Twin Falls*, 29 P.2d 352 (1934) ; see, also, *Town of Flagstaff* v. *Gómez*, 202 Pac. 401 (1921) ; Prosser, Law of Torts, *supra;* 2 Harper and James, The Law of Torts 1063 *et seq.* See *Morales* v. *Castro*, 85 P.R.R. 275 (1962), and *Pace* v. *American Radiator, etc.*, C.A. 7, 5-5-65, 33 U.S.L. Week 2591.

the latter is not duty bound to offer evidence to contradict that already offered by plaintiff, if it estimates that the latter's is insufficient to grant any relief. However, it entails risks since at the proper time the decisive and fair estimation and weighing of the probative force, credit and value of the evidence will be made by the trial judge alone, and it may or may not coincide with that of defendant. The situation becomes more serious where, as in this case, defendant informed plaintiffs under oath that Librada Huertas had witnessed the accident and that it was going to use her for its defense, and failed to produce her as a witness on such an important point in the case, thereby giving occasion to the application of the presumption that evidence wilfully suppressed will be adverse if produced—§ 102 (5) of the Law of Evidence—and to the rule of § 162 of that law that proof is to be estimated not only by its own intrinsic weight but also according to the evidence which it is in the power of one side to produce and of the other to contradict. All of this detracts certainty and merits from defendant's contention that plaintiffs' evidence was insufficient in law, since it failed to establish the manner in which the child fell into the pit of dirty water which H. I. Hettinger & Co. maintained without due and public protection during 10 days, the 24 hours of the day and night, in the middle of a narrow marginal street used occasionally by children to play and at all times for the transit by a whole great and thick human conglomerate,[8] thereby constituting a serious and unreasonable situation of danger.

---

[8] The Lloréns Torres housing project, built between 1950 and 1954 on a tract of 86 acres of land, consists of 144 several-storied buildings, divided into 2,610 apartments or dwelling units. By August and September 1961 it had formed a city of some 14,000 inhabitants, its population at that time being greater than that of the city of Humacao. Of this human concentration, 47.7 percent consisted of 6,641 children under 14 years of age. See the publication *Preliminary Study for the Plan for the Transformation of Luis Lloréns Torres Public Housing Project*, edited in 1963 by the Urban Renewal Corporation.

Appellant further contends that the reference made by the trial judge to the testimony of *Juan Luis Rosario*, and the existence in the record of a certain deposition made by this person, "shows that the judge considered the deposition in deciding the case." In the summary which we made of the testimony of witness Julio Rojas Cruz we said that the latter testified that Juan Luis Rosado, not Juan Luis Rosario, as named by defendant and by the trial court, had helped him to bring the child out of the excavation. This person did not testify. Yet, the respondent court set forth in its statement of the case—not in its conclusions—that "the oral evidence presented by plaintiffs consisted of the testimonies of both and of Julio Rojas and Juan Luis Rosario," The inclusion of the latter's name is a mere and innocuous error in the recital of the witnesses' names. There is no showing in the record to sustain the inference made by appellant in its brief. If that person had testified, perhaps it would have been in the sense of corroborating the statement made by Rojas Cruz. On the other hand, the said deposition has not been sent up to us with the original record nor with the petition for review.

Regarding the imposition of attorney's fees, we find no reason to eliminate it.

The judgment appealed from will be affirmed.